UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

J D, a minor
by Tushumi Turner, Guardian,

        Plaintiff,

        v.                                              Case No. 08-C-0069

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

---

DECISION AND ORDER REVERSING THE DECISION OF THE COMMISSIONER
AND REMANDING THE CASE PURSUANT TO SENTENCE FOUR

Tushumi Turner, proceeding on behalf of her minor son, J.D., appeals the denial of J.D.'s application for benefits under the Supplemental Security Income ("SSI") program of the Social Security Act. A SSI application was filed on behalf of J.D. alleging a disability that began on January 1, 2003, due to a mental disorder, behavioral problems, and asthma. The Agency denied the application initially and on reconsideration. Acting on Turner's request, Administrative Law Judge Margaret J. O'Grady held a hearing during which Turner, her son, and grandmother appeared without an attorney and testified. The ALJ issued a decision denying the claim, and the Appeals Council denied Turner's request for review on November 13, 2007, making the ALJ's decision the final decision of the Commissioner of the SSA. *See McCarty v. Astrue*, 528 F.3d 541, 543 (7th Cir. 2008). Turner now seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g).

Factual Background

J.D. was two years old at the time of his January 10, 2005, application for SSI and five years old when the Commissioner's decision became final. (R. 22, 51.) A

February 11, 2005, disability report set forth Turner's description of J.D.'s behavioral problems, which included hitting, kicking, inserting items into electrical outlets, tearing things, and banging his head against the wall. (R. 59.) In the Birth to Three Questionnaire for the Department of Health & Family Services Disability Determination Bureau, Turner stated that J.D. has behavioral and mental problems with temper tantrums, crying spells, and asthma. (R. 76.) Turner added that J.D. spins in a circle, skips back and forth, and makes clicking noises with his mouth. (R. 77.)

In a January 19, 2005, SSI Function Report, Turner advised that J.D., then two and one half years old, could not stack small blocks six high, hold a crayon or pencil with thumb and fingers (not fist), or walk up and down steps by himself. (R. 69.) Also, she reported that J.D. did not play catch or other simple games with children. (R. 70.) Further, in the Birth to Three Daily Activities Questionnaire, Turner indicated that J.D.'s mood affected his ability to play with others, and that he would try to fight, bite, or kick them. (R. 76.) J.D. was described as impulsive with no danger awareness, and Turner indicated that J.D. had night terrors at least three times a week. (R. 77.) According to Turner, weather changes triggered J.D.'s asthma. (*Id.*)

On December 25, 2004, J.D. was seen in a hospital emergency room for an upper respiratory infection without pneumonia. (R. 110.) On February 25, 2005, Turner took J.D. to the emergency room at St. Michael Hospital on February 25, 2005, for a cough, runny nose, and earache. (R. 106.) On that occasion, the x-ray examination of the lungs was positive for perihilar infiltrates and infiltrate in the right lower lobe. (R. 106-109.)

St. Francis Children's Center completed a questionnaire dated April 15, 2005, in connection with J.D.'s disability case. (R. 111-122.) Barb Hoclhiewicz, OTR, rated J.D.'s

2

ability to comprehend oral instructions, learn new material, recall and apply previously learned material a "3" on a scale from 1 to 5 (1 being "no problem," 3 being "obvious," and 5 being "a very serious problem.") (R. 116.) J.D. had "a very serious problem" carrying out multi-step instructions and "obvious" problems, refocusing on tasks when necessary, changing from one activity to another without being disruptive, and working without distracting self or others. (R. 117.) Similarly, there were "obvious" problems expressing anger appropriately and seeking attention immediately. (R. 118.) J.D.'s speech was intelligible no more than half the time when the topic of conversation was known, and very little when the topic of conversation was unknown. (R. 119.) There were only slight problems with motor skills, but an obvious problem with managing the pace of physical activities or tasks. (R. 119.) Hoclhiewicz noted that J.D. received psychiatric (behavioral) therapy at the Children's Hospital of Wisconsin (R. 121.), and that J.D. did not have a cold or ear infection since beginning school at St. Francis. (*Id.*)

J.D. participated in the Birth to Three Program from October 6, 2004, to July 15, 2005. On October 6, 2004, his receptive language skills were delayed 31 percent at the 15-18 month level (chronological age was 26 months), and expressive language was within the functional level at 25-27 months with significantly reduced intelligibility. (R. 160.) Oral motor and sensory delays affected feeding safety (chewing difficulties). (R. 159-160.) J.D. participated in therapy approximately every two weeks until July of 2005. (R. 138-160.) When therapy ended at age three, J.D. could still not stack five blocks, and remained impulsive and clumsy. (R. 138.)

A Speech Language Pathologist Questionnaire by Pamela Zierke dated April 10, 2005, reported that J.D.'s articulation/intelligibility was only 50 to 60 percent in

3

conversation. (R. 113.) Rosetti Infant-Toddler Language Scales (RITLS) placed receptive skills at 18-21 months with some scattered scores to 24-27 months when J.D. was nearly three years old. Without considering the impact of dialect, J.D. had RITLS of achieved skills in 24-27 months and scatter skills to 27-30 months. (R. 114.) In addition, J.D. had a receptive delay of 40 to 50 percent and an expressive delay of 10 percent. (*Id.*) Moreover, J.D.'s attention span was extremely limited although did not appear to be related to any lack of comprehension or language limitations. (R. 114.) Moreover, his tantrums were frequent with anxiety in certain activities and transitions. (*Id.*)

An April 25, 2005, report of contact note prepared by a State agency staff person with Pamela Zierke's assistance, revealed that J.D. suffered from an echolalic communication disorder. (R. 79.) Generally, echolalia is present when a person does not understand what is being asked of him. (*Id.*) Zierke reported that J.D. was understood over 50% of the time in unknown context, and with increased consistency when he repeats himself or is given direct models. (*Id.*) His ability to follow routines and process directions was impacted heavily by his behavior. (*Id.*) J.D.'s RITLS scores were reported to be 27-30 months for expressive communication and 18-21 months for receptive communication. (*Id.*) The Disability Report-Appeal indicated that the end of Birth to Three had an adverse effect on J.D., and that he had severe separation anxiety when school started. (R. 91)

Shortly before Birth to Three ended, Psychologist William Nimmer performed an evaluation for the State agency, which was developing the record for the Social Security Administration. Dr. Nimmer found that on the Bayley Scales, J.D.'s speech was incomprehensible unless there was a known referent that would make it 50 percent comprehensible. (R. 123.) J.D. earned a 27-month status on the mental and motor portions

4

of the scale. Other testing ranged from the borderline and higher. Dr. Nimmer stated that Turner "expressed surprise that he had done so well here interpersonally. Certainly he was willing to engage, not avoidant or difficult." Turner felt that this was a "good day" and Dr. Nimmer concluded that the results were valid. (R. 125.)

On May 19, 2005, two state agency psychologists and a speech language pathologist signed a form indicating that all impairments were severe, not equal to a listing and not meeting a listing, and less than marked. (R. 131-136.) They provided no reasoning for their findings, referring to a worksheet which was not attached to the report. (R. 131-136.)

At the hearing on May 22, 2007, the ALJ explained a claimant's right to an attorney, and Turner indicated that she was willing to proceed. (R. 261-262.) Turner testified that J.D. went to the 35th Street School, which offered a full day kindergarten (K4) program. (R. 269.) She explained that J.D. was in special education, and took the bus to school. (*Id.*) He had speech and occupational therapy at school, as well as therapy for his legs. (*Id.*) Since starting medication, J.D. was doing better but his behavior could still be unpredictable. (R. 270.) J.D. acted impulsively and sometimes harmfully. (*Id.*) Recently J.D. had been suspended from school for doing something indecent exposing a body part - either lifting his shirt or something else. (*Id.*) There were lots of disciplinary actions at school. (*Id.*)

Due to asthma, J.D. was always "sickly" and Turner did not think he participated in gym with the other students. (R. 270.) How he got along with other children depended on the day. (R. 271.) J.D. took Metadate CD (a reformulation of Retalin for sustained delivery) for hyperactivity and various medications for asthma. (*Id.*) He used

5

Albuterol with a nebulizer at least 2-3 times a day, and an Albuterol pump about twice a day. (R. 272.)

Turner testified that J.D. had some difficulty dressing himself. (R. 272.) He brushed his teeth, tried to tie his shoes, and took a bath or shower. (*Id.*) He could ride a bicycle with training wheels, but had problems with bed wetting and night terrors. (*Id.*) Turner described J.D.'s disruptive and potentially dangerous behavior at home, such as tying to eat soap or drink bleach. (R. 273.) J.D. saw Dr. Tan at the Shafi clinic for his asthma (R. 274.), and went to the Children's Society of Wisconsin clinic for his behavior problems. (*Id.*) Turner also testified that J.D. was abnormally strong, but also very clumsy. (R. 277.) J.D. started taking medication that had a calming effect about 2-3 months previously (R. 278.), and Turner observed that J.D. was not "nice" without the medication. (*Id.*)

J.D. answered simple questions about his age, whom he lived with, and what he did at school and home. (R. 263-268.) His grandmother testified that at two years J.D. became very impulsive, could not sit still, and did not listen. (R. 281.) The medication he started taking did not help much. (*Id.*)

The ALJ concluded that J.D. had the following severe combination of impairments: speech and language delays, developmental delays, disruptive behavior disorder, attention deficit hyperactivity disorder, and asthma. (R. 17.) Next, she determined that J.D. did not have an impairment or combination of impairments that meets or medically equals the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 19.), or that functionally equaled the listings. (R. 20.) The ALJ discussed the domains of acquiring and using information; attending and completing tasks; interacting and relating to others; moving

6

about and manipulating objects; caring for one's self; and health and physical well being. In each domain, the ALJ found that J.D. had no marked or extreme limitation. As a result, the ALJ concluded that J.D. was not disabled since January 10, 2005.

Analysis

The Social Security Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court will uphold an ALJ's decision if it is supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004)*; Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). A decision is supported by substantial evidence if the ALJ identifies supporting evidence in the record and adequately discusses the issues. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). The court determines whether the decision is supported by substantial evidence by reviewing the entire record, but cannot substitute its judgment for the ALJ's by reconsidering facts, re-weighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Jens*, 347 F.3d at 212. In doing so, the court considers whether the ALJ articulated an "accurate and logical bridge from the evidence to the conclusion" which the court can follow. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Briefly, a child under the age of eighteen is eligible for SSI benefits if he has a medically determinable mental or physical impairment that causes marked and severe functional limitations which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(I). A physical or mental impairment is one that results from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable

7

clinical and laboratory diagnostic techniques. 42 U.S.C. § 1382c(a)(3)(D). In determining whether impairments are disabling, the combined effect of all of a child's impairments must be considered, without regard to whether any single impairment alone is of disabling severity. 42 U.S.C. § 1382c(a)(3)(G).

On appeal, Turner raises four issues. First, whether she validly waived her right to an attorney. Second, whether the ALJ fully and fairly developed the record. Third, whether the ALJ properly evaluated whether the child's condition met, medically equaled or functionally equaled the listings. And, fourth, whether the ALJ made a proper credibility determination.

As an initial matter, Turner claims the ALJ failed to obtain a valid waiver of counsel. An SSI applicant's right to be represented by counsel at a disability hearing is statutory, see 42 U.S.C. § 406; *Nelson v. Apfel*, 131 F.3d 1228, 1231 n. 1 (7th Cir.1997); *Binion v. Shalala*, 13 F.3d 243, 244 (7th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d 581, 584-85 (7th Cir.1991); 20 C.F.R. § 404.1700, but the right may be waived, *see Thompson*, 933F.2d at 584. To ensure valid waivers, ALJs must explain to pro se claimants: "(1) the manner in which an attorney can aid in the proceedings; (2) the possibility of free counsel or a contingency arrangement; and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Binion*, 13 F.3d at 245; *Thompson*, 933 F.2d at 584.

At the start of the hearing, the following exchange took place:

> ALJ: I need to explain to you about representation. There are various things an attorney or representative can do in these hearings .... An attorney or representative can get documents, present

8

|  | argument, question witnesses. There are legal services groups that can provide help at low or no cost. There are private attorneys, non-attorney representatives that can handle Social Security cases. They can take the case on what's called a contingency fee arrangement and that's where the fee is not paid unless the claim is won. The fee is paid out of back benefits that are received. There's a maximum amount allotted by law for the fee. At this time, it's set at 25% of the back benefits received or $5300, whichever is less. And the fee would need to be approved by the Administrative Law Judge. Did you want additional time to try to get an attorney or representative to handle your child's case? |
|---|---|
| WTN1: | I might do need to, but I've been having a lot of problems with him as far as getting help, so — |
| ALJ: | Well, the choice is I can continue it since this is the first time the case is up for you to look into representation or we could go ahead today with you representing the child, but that's your choice. I will give you a continuance if you want, a continuance to get an attorney or representative. |
| WTN1: | You can go ahead with – |
| ALJ: | Okay. You don't want a continuance? Is that correct? |
| WTN1: | No. |
| ALJ: | I'm sorry? |
| WTN1: | No. |

Although the ALJ conformed with the three-pronged test, the court is concerned that the mother, who is a non-attorney, was interrupted several times before

9

stating that she would proceed pro se on behalf of her minor son. Certainly there is a right to proceed pro se in civil actions. 28 U.S.C. § 1654. However, there is particular concern when a child, who cannot make legal decisions, is allowed to proceed with someone not trained in the law acting on his or her behalf. Case law from several other circuits holds that parents may proceed pro se on behalf of their children in social security cases. *See, e.g., Machadio v. Apfel*, 276 F.3d 103 (2d Cir. 2002); *Harris v. Apfel*, 209 F.3d 413 (5th Cir. 2000). That being said, the prudent course is to ensure that the parent understands and makes an informed decision regarding representation.

Nevertheless, the failure to obtain a valid waiver does not alone warrant remand. An ALJ's failure to obtain a valid waiver of counsel merely heightens her duty to develop the record. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Indeed, the ALJ must "scrupulously and conscientiously probe into, inquire of and explore for all relevant facts." *Id*. at 841-42. The burden then rests on the Commissioner to demonstrate that the ALJ adequately developed the record. *Binion,* 13 F.3d at 245. If the ALJ fails to satisfy this heightened duty to develop a full and fair record, then the plaintiff is entitled to a remand based on inadequate notice of the right to representation.

The hearing, which lasted approximately forty minutes, is recorded in twenty-four transcript pages. During the proceeding, the ALJ questioned J.D., then four years old, about school and family. (R. 263-268.) She then questioned J.D.'s mother and grandmother. While the length or brevity of a benefits hearing is not dispositive of whether the ALJ fulfilled the obligation to adequately develop the record, *Thompson*, 933 F.2d at 584, a perfunctory hearing may be indicative of such a failure, *see, e.g., Henderson v. Barnhart*, 205 F.Supp.2d 999, 1010 (E.D. Wis. 2002) (finding that the Commissioner had

10

not demonstrated a fully and fairly developed record where the hearing "was brief, almost perfunctory, lasting barely one-half hour").

Turner referred to J.D.'s impulsiveness and hyperactivity when testifying regarding medications, but there was no questioning regarding any diagnosis. The ALJ learned of the ADHD after the hearing in the May 14, 2007, Progress Review obtained from the Children's Service Society of Wisconsin (R. 250) but made no further inquiry. In addition, Turner submitted an intake summary from the Birth to Three program, which was referenced during the hearing, but omitted from the record with the exception of the last two pages. (R. 154-155.) Indeed, one of the evaluating physicians referenced in the record felt that J.D.'s current level of cognitive, emotional and behavioral functioning was best identified through this document – the formal comprehensive pediatric psychological evaluation completed by Birth to Three. (R. 187, 188.) Although defendant argues that this summary is not consistent with the remainder of the record and would not change the ALJ's conclusion, the fact remains that it was not considered. Further, the court is troubled by the number of instances in the record where it appears that the ALJ was rushing, cutting off or otherwise interrupting testimony. (R. 274, 275, 279, 280, and 282-283.)

In addition to these concerns, Turner argues that the ALJ failed to consider whether the listings were met and did not properly evaluate whether the medical diagnoses and severity were the medical or functional equivalent to a listing. The ALJ wrote perfunctorily:

> The undersigned considered Section § 111.09A, B, and C Communication Impairment; § 112.02 Organic Mental Disorder; § 112.05 Mental Retardation, § 112.11 Attention Deficit Hyperactivity Disorder; § 112.12 Developmental and Emotional disorders; and § 103.03 Asthma, but does not find in the

11

> medical record evidence that claimant's impairments meet those listings.

Because the case presented a mixture of behavioral problems affecting learning, communication and social interaction, Turner maintains that the ALJ should have enlisted the help of a medical expert to help her with the task of medical and functional equivalence.

On the other hand, defendant argues state agency psychologists Drs. Michael J. Mandli and Cathy Propper and state agency psychologist Lauri Triller reviewed the medical and school records in May and August of 2005, and opined that J.D. had severe impairments. At the same time, defendant admits that this assessment was made without these medical providers having the benefit of the entire medical record. To the extent that records were missing and not considered and where one of these records suggests an impairment that could be considered marked or extreme, further review is warranted.

Similarly troubling is the absence of a proper credibility determination. Social Security Ruling 96-7p requires an ALJ to consider the entire case record and to articulate specific reasons to support her credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). An ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence," but cannot state simply that an individual's allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2001); S.S.R. 96-7p.

Next, the ALJ's summary and discussion of the testimony by Turner and her grandmother is limited. There is one short paragraph on page 6 of the decision in which the ALJ refers to the mother's "vague" statements regarding bedwetting. In addition, at page

12

9 of the decision, the ALJ writes: "Although claimant's mother described a history of behavior problems, the undisputed evidence from school officials, therapists, and family physicians reveals the claimant's difficulties in this area are not as serious as she claims and are not as prevalent as alleged." (R. 21.) Moreover, there was no discussion of the type, dosage, effectiveness and side effects of medications as part of the ALJ's credibility determination as required by Rule 96-7p notwithstanding evidence in the records that the medication was not working. (R. 242, 243, and 204.) For all of these reasons,

        IT IS ORDERED that the decision of the commissioner is reversed.

        IT IS FURTHER ORDERED that this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).

        Dated at Milwaukee, Wisconsin, this 15th day of June, 2010.

        BY THE COURT

        /s/ C. N. Clevert, Jr.
        C. N. CLEVERT, JR.
        CHIEF U. S. DISTRICT JUDGE